Citigroup Global Mkts. Inc. v SCIP Capital Mgt., LLC (2025 NY Slip Op 50251(U))

[*1]

Citigroup Global Mkts. Inc. v SCIP Capital Mgt., LLC

2025 NY Slip Op 50251(U)

Decided on February 27, 2025

Supreme Court, New York County

Chan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 27, 2025
Supreme Court, New York County

Citigroup Global Markets Inc. et al., Plaintiffs,

against
SCIP Capital Management, LLC and THE SILVERFERN GROUP, INC., Defendants.

Index No. 651031/2019

Counsel for Plaintiffs: Thomas E.L. Dewey, Jenifer L. Salzberg, and Sean K. Mullen of Dewey Pegno & Kramarsky LLP
Counsel for Defendants: Marc E Kasowitz, Leonard A. Feiwus, Edward E. Filusch, Veronika Alayeva, Michael C. Pecorini, Joshua B. Marks, Jacob M. Sievers, and Kevin J. Frank of Kasowitz Benson Torres LLP

Margaret A. Chan, J.

Before the court is a thorny dispute arising out of a private equity club formed pursuant to a certain Distribution Agreement, dated January 12, 2012 (the Agreement). In one corner are plaintiffs/counterclaim-defendants Citigroup Global Markets, Inc., Citigroup Global Markets Limited, Citigroup Global Markets Asia Limited, Citigroup Global Markets Singapore Pte Limited, Citibank, N.A., New York Branch, Citibank, N.A., London Branch, Citibank, N.A., Zurich Branch, Citibank, N.A., Geneva Branch, Citibank, N.A., Singapore Branch, Citibank, N.A., Hong Kong Branch, Citibank, N.A., Jersey, Channel Islands Branch, Citibank International plc, Citibank (Switzerland) AG, Citibank Canada Investment Funds Limited, Cititrust (Bahamas) Limited, and Citibank, N.A. (collectively, Citi), who commenced this action on February 19, 2019, to collect millions of dollars in contractually mandated fees owed under the Agreement (NYSCEF # 1). In the other corner are defendants/counterclaim-plaintiffs SCIP Capital Management, LLC and the Silverfern Group, Inc. (together, Silverfern), who fiercely dispute Citi's entitlement to any fees. Instead, Silverfern contends, its payment of fees was excused because Citi materially breached several key terms of the Agreement and, in turn, caused Silverfern to incur millions in damages (see NYSCEF # 28).
By Decision and Order, dated July 18, 2023, this court denied Citi's motion seeking summary judgment in its favor on its breach of contract claim and for an order dismissing Silverfern's counterclaim (NYSCEF # 319). In so holding, the court concluded that (1) Silverfern had identified triable issues of fact concerning Citi's purported breaches of the Agreement, and (2) Citi had failed to make a prima facie showing that it was entitled to dismissal of Silverfern's counterclaim (id. at 6-7). That decision was affirmed on appeal by the First Department on March 28, 2024 (NYSCEF # 325). The court thereafter conducted an eight-day bench trial from September 16, 2024, through September 24, 2024. During the trial, the court heard testimony [*2]from ten Citi witnesses and three Silverfern witnesses (including two experts). The parties thereafter made their closing arguments and submitted post-trial briefing.
For the reasons that follow, and upon careful consideration of the testimony and evidence adduced at trial, the court enters judgment in Citi's favor on its breach of contract claim and dismisses Silverfern's counterclaim with prejudice.
FINDINGS OF FACT
Beginnings of the Citi-Silverfern Relationship
Plaintiffs are subsidiaries of Citigroup, Inc. a global financial services institution that provides a range of financial service and products, including private banking, as well as wealth management to ultra-high net worth individuals and family offices, through its Citi Private Bank (CPB) (see Tr 45:3-25; NYSCEF # 354 — pltfs proposed FOF ¶ 1; NYSCEF # 365 — dfts proposed FOF ¶ 1). Silverfern is a private equity firm whose business includes structuring "co-investments" through which individuals and single-family offices can participate in private equity transactions (see Tr 850:20-15, 853:19-23, 854:10-856:15; PX-758 at 1).
In or around 2010, Citi and Silverfern began exploring possible joint business opportunities (pltfs proposed FOF ¶ 3; dfts proposed FOF ¶ 3; tr 857:7-858:5; JX-003 at ). Following a series of meetings and negotiations, the parties settled on a private equity "club" (the Equity Club) through which Silverfern could market its co-investment opportunities to Citi's ultra-high net worth clients with investable assets of at least $100 million (see tr 146:19-147:7; PX-780 at tr 101:19-25; see also pltfs proposed FOF ¶ 4; dfts proposed FOF ¶ 4).
This Equity Club was viewed as a mutually beneficial partnership. Citi could offer its clients an attractive private equity co-investment program that capitalized on Silverfern's "exclusive access to robust proprietary deal flow" (JX-003 at Citi_0060181; DX-002 at Citi_0153486; DX-021 at Citi_0126583). Meanwhile, Silverfern could expand its reach to Citi's clients through Citi's investment "platform" (see Tr 48:10-18, 54:2-7).
The Agreement
Following an 18-month period of due diligence regarding Silverfern (see DX-021 at Citi_0126583-584), Citi agreed to offer the Equity Club on its platform (JX-003 at Citi_0060181; Tr 858:20-859:13). To facilitate this new offering and formalize the parties' obligations, Citi and Silverfern entered into the Agreement on January 12, 2012 (JX-010 — Agreement at Citi_0098836).
As the parties acknowledged in the Agreement, Silverfern, as part of the Equity Club, intended to "form certain single-purpose limited partnerships (each, collectively, with one or more related investment entities that may be established to invest in or in parallel with such limited partnership, an 'Investment Partnership' and, collectively the 'Investment Partnerships')" (see id. at WHEREAS[A]). Each of these Investment Partnerships would, in turn, "invest alongside certain private equity firms and/or other capital sources . . . in a transaction (or series of related transactions) with respect to a private equity or similar co-investment opportunity related to a target entity and its affiliates (each, a 'Transaction' and, collectively, the 'Transactions')" (id.). Silverfern, as Manager under the Agreement, was to prepare and distribute deal documents and agreements, hold presentations and meetings, and market any deals offered under the Equity Club (see id. §§ 1[c][ii], 2[d]; see also Tr 874:21-24).
Citi was appointed as "Placement Agent" on an exclusive basis "with respect to the [*3]Equity Club Investors . . . in connection with the proposed offer and sale of Class B Interests"[FN1]
in Investment Partnerships that would be offered on Citi's platform (see Agreement § 1[a][i]). As Placement Agent, Citi agreed to "use its best efforts to offer the Class B interests to the Equity Club Investors on terms that have been approved by Silverfern" (Agreement § 1[a][ii]). Although the term "best efforts" is not specifically defined in the Agreement, the Agreement did set forth a series of "services" that Citi would perform as Placement Agent (see id. § 1[c]). This included, among other things, (1) "identif[ying] [] Equity Club Investors"; (2) "cooperating with Silverfern to facilitate the distribution" of due diligence packages for each of the Investment Partnerships; (3) "arranging presentation meetings between Equity Club Investors . . . and representatives of Silverfern"; (4) "monitoring and forwarding to Silverfern any requests for additional information by Equity Club Investors and assisting with the fulfillment of such due diligence requests"; (5) "maintaining such marketing records for the placement of Class B Interests under this Agreement as required under [Citi's] internal policies and procedures"; and (6) "assisting Silverfern in the placement of Class B Interests with Equity Club Investors" (id. § 1[c][i]-[vi]). Citi also separately agreed that, absent obtaining written consent from Silverfern, it could not provide any Equity Club Investors with (1) any "Partnership Documents"—i.e., as delineated in Section 1(c)(ii), investment offering materials, partnership agreements, subscription agreements, and governing documents prepared in connection with each Investment Partnership—or, as is relevant here, (2) "other information relating to any Investment Partnership or any Transaction that are not prepared by Silverfern" (Agreement § 1[c][A]).
The Agreement provided for a shared fee structure. Specifically, under Section 3(a), Silverfern was entitled to receive a quarterly management fee of two percent (2%) per annum from each Equity Club member based on the member's capital commitment and subsequent contributions to the Equity Club (Agreement § 3[a]). It would then pay 50% of that fee to Citi (the Placement Fees) (id.). Meanwhile, under Section 3(d), Silverfern was also entitled to receive 20% carried interest distributions from each of the Equity Club members' investments (id. § 3[d]). Silverfern would then pay 25% of the "carried interest" it receives to Citi as an incentive fee (the Incentive Fees) (id.). In the event that Silverfern sold "securities to any Equity Club Investor" outside of the Equity Club, Citi could also still be entitled to payment of any applicable Placement Fees or Incentive Fees (see id. § 4[g]).[FN2]

The parties agreed that the Agreement would remain in full force and effect for a three-year period (Agreement § 7[a]). Silverfern, however, could, in its "sole discretion," exercise up to three one-year extensions (id.). The original term of the Agreement ran from January 12, [*4]2012, through May 30, 2015, but, because Silverfern ultimately executed all three one-year extensions available under the Agreement, the full term of the Agreement ran between January 12, 2012, through May 30, 2018 (JX-063; JX-091; pltfs proposed FOF ¶ 6; dfts proposed FOF ¶ 6).
The Initial Launch of and Subsequent Participation in the Equity Club
The offering period for the Equity Club began in April 2012. During this time Citi clients were introduced to Silverfern and the Equity Club at a series of roadshows conducted across several continents (pltfs proposed FOF ¶ 7; dfts proposed FOF ¶ 7; Tr 871:15-20). Meanwhile, concurrent with this outreach, Citi's bankers and investment counselors all testified that they received training about the Equity Club and its operations (see Tr 50:4-16, 267:18-270:10, 385:2-10, 681:14-682:5). Each Citi witness understood, consistent with the responsibilities delineated in the Agreement, that the role of Citi bankers, investment counselors, and their respective teams was to facilitate connectivity between Equity Club members and Silverfern regarding Equity Club deals (see e.g. Tr 60:18-61:13, 128:11-17, 272:9-274:17, 387:3-16; 454:13-455:4, 491:7-22, 639:19-641:1, 690:22-691:7; PX-780 at Tr 108:20-109:08, 200:7-200:12, 211:7-19; PX-781 at Tr 163:6-12).
By September 2013, a total 39 Citi clients agreed to join the Equity Club, with each making soft, non-binding investment commitments that totaled $470 million in aggregate (Tr 60:1-7, 596:7-12; 861:4-11, 870:25-871:8; DX-234 at "Citi Equity Club Data" tab, row 6, col B). From there, consistent with the Club framework set forth in the Agreement, Silverfern would touch base with Equity Club members by announcing deals and providing access to deal documents (upon entering a non-disclosure agreement), while Citi personnel facilitated communications and relations between Equity Club members and Silverfern (see e.g. PX-014 at Citi_0058786-788; PX-057 at SF00039357-358; PX-070 at SF00328246; PX-084 at SF00246280-282; see also Tr 186:8-187:11). At all relevant times, Citi employees were prohibited from giving opinions and recommendations on the merits of a co-investment opportunity (see JX-037 at Citi_0008653). Instead, Equity Club members performed their own diligence on potential investments (see JX-005 at Citi_0089173, § 3.1[d]).
The initial investment opportunities offered to Equity Club members by Silverfern at the outset of the Equity Club—namely, an oilfield services company (O-Tex) in June 2012, a telecom company (LPN) in March 2013, and an IT support services provider in India (CSS) in April 2013—achieved participation rates of 100%, 93%, and 33%, respectively (DX-234 at Time Order Equity Club Summary tab, row 27, cols F-H; PX-041 at SF00089614-616; PX-765 at SF00469978). Thereafter, between 2014 and 2015, Silverfern offered seven additional deals (DX-233 at Citi_0117968). Those deals, in turn, boasted participated at rates of 46%, 44%, 30%, 37%, 42%, 55%, and 29%, respectively (see DX-234 at Time Order Equity Club Summary tab, row 27, cols I-O), all of which were viewed as a success by all parties involved (see Tr 4:22-25, 889:1-890:1; see also NYSCEF # 28 ¶¶ 117-120). At all relevant times during these offerings, Citi facilitated the offering of deal information and the relevant communications between Silverfern and the Equity Club members to assist with Silverfern's offering of these deals (see generally Tr 231:21-25, 888:11-890:1).
Silverfern Approaches Citi About Offering an SMA Product
In 2014, with the Equity Club in full swing, and after discussing the prospect with current Equity Club members (see e.g. PX-176 at SF00378600-602; PX-175 at SF00378716), Silverfern [*5]approached Citi about the possibility of offering a Separately Managed Account (SMA)[FN3]
 investment program to Equity Club members (see JX-045 at SF00335732; JX-047 at Citi_0205799; Tr 195:5-9, 891:12-22). Citi agreed to consider the program for Citi's platform and sought approval from its Alternative Investments Operating Committee (AIOC) and Distributed Products Approval Committee (DPAC) (see JX-047 at Citi_0205805; DX-122 at Citi_0205856).
Initially, and consistent with the recommendations of Citi employees Dan O'Donnell and Marc Rucinski (JX-047 at Citi_0205805), AIOC approved the SMA program (see DX-122 at Citi_0205857). But approval from both committees was necessary for the SMA product to be offered on Citi's platform (see Tr 249:1-3).[FN4]
Although Silverfern's co-founder, Clive Holmes, testified that Silverfern was never given any indication that the SMA would not be approved during this period (see Tr 895:8-9), none of the evidence or testimony adduced at trial indicated that Citi had ever communicated that DPAC approval was a foregone conclusion. Hence, Silverfern was instructed not to discuss the SMA with Equity Club members until the full approval process was completed (see JX-049 at Citi_0154344).
While the SMA product underwent review, Citi employees originally contemplated an approval date of early to mid-October 2014 (JX-049 at Citi_0154344). By late 2014, however, Citi employees and executives had begun expressing concern about whether the SMA would receive DPAC approval. Factors that appeared to contribute to this concern were the blind pool nature of SMA, Silverfern's experience with such funds, and comments made by Citi's DPAC Chair, Richard Janiak (see JX-054 at Citi_0155139; Tr 106:19-25). The SMA proposal thereafter remained pending before DPAC for several months (see Tr 894:21-895:9; see also JX-064 at Citi_0149285). Ultimately, DPAC never approved the SMA (see Tr 107:1-2, 894:10-12; see also pltfs proposed FOF ¶ 17; dfts proposed FOF ¶ 17).
Silverfern Launches the SMA/RSMA
While it awaited word from Citi regarding SMA approval process, Silverfern continued to receive and respond to inquiries about the SMA from Equity Club members in late 2015 and early 2016 (see JX-069; PX-352; PX-358). Eventually, although it had not yet heard back from Citi about the SMA, on March 28, 2016, Silverfern officially launched the SMA/RSMA [FN5]
and [*6]began offering it to its investors, including members of the Equity Club (see JX-073; JX-074; PX-373; Tr 896:8-15). As part of its solicitation emails, Silverfern circulated RSMA documentation and notified recipients of "two critical dates that [they] need to be aware of": (1) April 29, 2016, which was the date investors needed to "complete and execute [the] RSMA documents," and (2) June 30, 2016, which was the final closing date of the Silverfern fund in which SMA investments would be pooled (see JX-073 at SF0369067; JX-074 at SF0368730; PX-373 at SF00381427). Silverfern then indicated that, if potential investors did not "establish [an] RSMA" by the June 20, 2016 closing date, they "may not open an RSMA until fundraising ha[d] commenced or the successor" to the fund (id.). However, Silverfern clarified, "no guarantee of availability of further investments allocations [could] be provided" (id.).
Following these emails, at least three Equity Club members agreed invest a total of $12.5 million in the RSMA (see Tr 905:23-906:1; DX-234 at RSMAs tab, rows 2-4, col B). And, as a result, at least some of these RSMA investors ceased investing through the Equity Club (see Tr 1055:10-1056:16). Other Equity Club members ultimately declined the opportunity (see DX-187 at Citi_0001519; PX-453 at SF00412797; PX-373 at SF00381427).
Concurrent with its March 2016 outreach, Silverfern notified Citi employees that (a) the RSMA fund had "officially launched," (b) documentation regarding the RSMA product had been sent to eight Equity Club members who had previously requested information, and (c) all other members of the Equity Club would be informed of the existence RSMA product as a "lower fee" option for them (JX-075 at Citi_0157102; Tr 110:16-111:10, 461:2-6, 896:16-21). Silverfern then reconfirmed "that Citibank will continue to be paid its pro-rated share of the management fees and carried interest charged through each RSMA set up by a Silverfern Equity Club member" (JX-075 at Citi_0157102).
Silverfern did not receive an immediate response to its email to Citi (see Tr 899:6-7, 903:7-10). But as testimony and exhibits adduced at trial indicate, Citi's internal reaction to this email was one of confusion and concern. For example, Dan O'Donnell testified that he was "concerned" that Silverfern was "showing a product to our clients that had not been approved" by Citi's requisite approval committees and diligence process (see Tr 111:22-25). Other Citi witnesses echoed that sentiment, explaining that Silverfern's email created "confusion" and "concern" that Clive Holmes was actively marketing opportunities to Equity Club members outside of the Equity Club (see Tr 461:21-23, 564:8-11, 581:7-11).[FN6]

These witnesses' sentiments were corroborated contemporaneous internal Citi emails sent [*7]after the March 28, 2016 email, including one email in which a Citi employee characterized the situation as "a mess" because Citi bankers had been "caught off guard" about the SMA product launch and clients were seeking clarification about Citi's "position" on the RSMA (see JX-077 at Citi_0156995). Similar concerns were articulated by Citi's bankers based in the Asia-Pacific region during this same period of time (see DX-169 at Citi_0150227).
Evidence and testimony in the record establishes that Citi also had regulatory concerns with the marketing of the SMA product to its Asia-based clients. As early as 2015, when the SMA product was still being assessed by DPAC, Citi employees were soliciting regulatory feedback with Citi's Asia-Pacific legal team regarding the SMA (see e.g. PX-283 at Citi_0149333). This was because, as Citi employees testified, regulations concerning investment offerings were "more stringent" in the Asia-Pacific region than other regions (Tr 508:25-509:4; see also Tr 687:9-14, 735:18-21). Silverfern had previously acknowledged these regulatory restrictions associated with marketing investment products in the Asia-Pacific region (including Hong Kong, Singapore, and Taiwan) in the early days of the Equity Club (see PX-006 at SF00023588; PX-044 at SF00344233-234), and those regulatory concerns were again communicated to Silverfern in 2015 while the SMA product was still under review (see PX-277 at SF00348958; Tr 1048:13-1049:5).
Given these concerns, on March 30, 2016, Citi's Private Equity/Real Estate (PE/RE) team provided clarity to Citi bankers and investment counselors by communicating that the SMA/RSMA and related Silverfern fund were investment products "outside of the Silverfern Private Equity Club" and were therefore not being offered by Citi (see JX-078 at Citi_0112521). Several days later, on April 4, 2016, PE/RE circulated additional information about the SMA/RSMA (JX-088 at Citi_0000004-005; Tr 465:9-19). In this correspondence, it confirmed that, although Silverfern is permitted to directly speak with members of the Equity Club, the SMA product was being offered independent and separate from the Equity Club and had not been reviewed by Citi (id. at Citi_0000005). PE/RE further communicated that Citi could not provide documents or other details concerning the RSMA to Citi clients (id.). The email then concluded that, under the terms of the Agreement, Citi entities may be entitled to compensation in the event that Equity Club members subscribe to the SMA/RSMA (id.). The email did not indicate at this point whether Citi would ultimately be foregoing such fees (see generally id. at Citi_0000004-006). But eventually, on April 12, 2016, Citi confirmed that it would be foregoing any compensation related to the SMA/RSMA (JX-089 at Citi_0045085).
The April 2016 Letter
While Citi was providing internal clarification about the SMA/RSMA, it was preparing a letter to Equity Club members about "the Silverfern offerings" (JX-078 at Citi_0112521; JX-088 at Citi_0000005). At least one Citi witness, Dan O'Donnell, credibly testified that the purpose of this letter to clients was to serve as a "point of clarification" and "ensure that [Citi's] bankers didn't inadvertently breach various local regulations by participating in the solicitation of products that weren't on the platform" (Tr 120:17-21). Citi worked with internal and external counsel, as well as other Citi employees, on this letter, and it also obtained DPAC approval (see Tr 216:19-217:5, 619:14-15; DX-288 at Citi_0157598). All parties agree that Citi did not communicate with Silverfern about the letter during this process (see Tr 216:3-18).
Citi circulated this letter to Equity Club members on April 11, 2016 (JX-088 at Citi_0000003; DX-172 at Citi_0080555; JX-087 — the April 2016 Letter at Citi_0000001). The April 2016 Letter was addressed to Silverfern investors "in connection with [their] participation [*8]in one or more Silverfern investments . . . and the marketing of certain other products by [Silverfern]" (April 2016 Letter at Citi_0000001-002).
In the letter, Citi explained that it had been "recently notified by Silverfern that Silverfern [was] marketing additional products unrelated to the Silverfern Contract," which the letter defined as "Additional Products," and that Silverfern either had or may reach out to letter recipients regarding such products (April 2016 Letter at Citi_0000001). Citi then clarified that (1) "the Additional Products are not being offered pursuant to the Silverfern Contract or as part of your being a party to the Silverfern Contract" (id. at Citi_0000001). Citi then explained that (1) it was "not involved in such offerings, ha[d] not reviewed any documents or conducted any diligence in connection with such offerings or Silverfern's ability to offer such Additional Products in your region," (2) "no services will be provided by Citi with respect to any investments in such Additional Products by you," and (3) it would accept "no responsibility or liability for any Additional Products," meaning that "any decision [an investor] make[s] to invest in any Additional Product is taken at [its] own risk (id.). The April 2016 Letter further acknowledged that Citi may be entitled to collect fees if Silverfern opts to sell securities outside of the Equity Club (id. at Citi_0000001). Nonetheless, Citi explained, it "may elect, as a result of limitations under applicable law or for other reasons, not to collect any fees from Silverfern" related to "investment[s] in Additional Products" (id.).
Although there was no explicit acknowledgment in the letter that Additional Products was in reference to the SMA/RSMA, each Citi witness who testified at trial indicated their understanding that Additional Products meant either the SMA/RSMA or, at minimum, other investment opportunities being offered outside of the Equity Club (see e.g. Tr 194:3-13, 355:6-23, 439:12-17, 729:15-17). The April 2016 Letter did not refer to or opine on any existing or future Equity Club investment opportunity or otherwise indicate a change in status of the Equity Club (see generally April 2016 Letter at Citi_0000001-002). Nor did the April 2016 Letter disparage or criticize Silverfern, the Equity Club, the SMA/RSMA, or any other Silverfern products that were unaffiliated with the Equity Club (see generally id.).
Citi concluded the April 2016 Letter by directing recipients with "any questions about any Additional Products" to contact "the Silverfern representative who has or will reach out to you regarding the offering of those products" (id. at Citi_0000002). Yet there was no immediate reaction to the April 2016 Letter. For instance, Clive Holmes testified that he did not receive any inquiries regarding the letter until mid-to-late 2018 (see Tr 998:7-16, 998:25-999:8). Similarly, many of Citi's witnesses at trial indicated that they did not receive any inquiries from Equity Club members about the contents or impact of the April 2016 Letter after it was sent (see Tr 322:7-8, 420:3-5, 466:13-16, 514:9-11, 653:3-12). Meanwhile, nothing in the record indicates that, because of the April 2016 letter, Citi bankers and investment counselors altered the way they communicated with and serviced Equity Club members (see Tr 322:2-21, 420:3-16, 492:10-15, 522:7-11, 653:16-22, 698:3-25). Nor is there anything in the record suggesting confusion on the part of Citi employees as to whether Citi would continue to support the Equity Club.[FN7]

On June, 14, 2016, approximately two months after Citi circulated the April 2016 Letter, Dan O'Donnell, on behalf of Citi, communicated directly to Silverfern that Citi "cannot have anything to do with any RSMA" and would not be sharing in any fees derived from it (see PX-466 at SF00169135-136; see also Tr 993:24-996:21). The next day, Rucinski, in his capacity as Asia Pacific Head of Real Estate and Private Equity for CPB, communicated to Citi bankers in the Asia-Pacific region that "due to increased regulatory risk associated with Silverfern's launch of new products that are not on" CPB's platform, "Clive Holmes and other representatives from Silverfern will no longer be invited to come to Asia by [CPB] to meet with [CPB's] clients" (JX-096 at Citi_0085489). Rucinski also acknowledged that Holmes may still visit the Asia-Pacific region on his own, in which case CPB bankers and investment counselors must avoid attending any such meeting in light of the aforementioned regulatory risks (id.).[FN8]
Concurrent with this email, as Holmes conceded at trial, Silverfern was also advised about these restrictions (see Tr 977:12-979:5).[FN9]

Subsequent Equity Club Developments
Three days after Citi circulated the April 2016 Letter, Silverfern offered its eleventh Equity Club deal for investment in a European baked-goods producer (PX-379 at Citi_0027139). Consistent with prior Equity Club deals, Citi bankers facilitated communications with Equity Club members and Silverfern to ensure they considered and communicated with Silverfern about this latest investment opportunity (see e.g. id. at Citi_0027138; PX-386 at Citi_0028579; PX-392 at Citi_0027605; PX-393 at Citi_0026613; PX-447 at Citi_0020950-954; PX-659 at Citi_0021924-925; see also Tr 324:23-327:9, 343:14-23). Equity Club members' participation remained consistent with the level of participation in prior Equity Club deals offered by Silverfern, and their amount invested was comparable to the amount raised from Class A investors (see DX-234 at "Time Order Equity Club Summary" tab, cols H, K, L, O, & P, rows 3-9, 27 & "All Partnerships Detail" tab, col AD, rows 50-157).
Later, in May and June 2016, Silverfern announced additional follow-on investments in previously offered Equity Club deals (see PX-4203 at Citi_0112553; PX-431 at Citi_0044621; PX-454 at Citi_0019476). As with prior Silverfern deals, Citi employees continued to facilitate [*9]communications between Equity Club members and Silverfern regarding these investment (see e.g. PX-423 at Citi_0112552; PX-428 at Citi_0020316; PX-429 at Citi_0020859; PX-436 at Citi_0019386; PX-454 at Citi_0019472), and they also appropriately declined to provide deal-specific advice when solicited (see e.g. PX-431 at Citi_0044621).
Between September 2016 and October 2017, Silverfern offered five additional deals to Equity Club members (see DX-234 at "Time Order Equity Club Summary" tab, rows 2, 4, col Q-T, V; PX-504 at SF00096862; PX-517 at Citi_0029373; PX-534 at SF00007444; PX-576 at Citi_0157117; PX-604 at Citi_0001188-189; PX-682 at Citi_0022805). Generally speaking, although one Citi employee was uncertain about whether one of these deals was being offered through the Equity Club (see JX-098 at Citi_0080707), contemporaneous evidence adduced at trial nonetheless indicates that Citi bankers continued to facilitate communications and relations between Equity Club members and Silverfern for these final Equity Club deals (as well as related follow-on investments) (see PX-504 at SF00096861; PX-517 at Citi_0029365-367; PX-518 at Citi_0022401; PX-534 at SF00007443-444; PX-567 at Citi_0000570; PX-572 at Citi_0156952; PX-629 at Citi_0034827-828; PX-659 at Citi_0021924; PX-670 at Citi_0131341; PX-690 at SF00329501).[FN10]
Equity Club members' participation rates for these deals were consistently lower than prior deals (see DX-234 at "Time Order Equity Club Summary" tab, row 27, cols Q-T, V). These participation rates, however, matched the participation levels of Silverfern's other investors, including its Class A investors (see id. at "Time Order Equity Club Summary" tab, row 3, cols Q-T, V & "All Partnerships Detail" tab, Rows 50-90, cols AG-AK, AM).
The Underlying Fee Dispute
On November 2, 2016, as it was soliciting investments from Equity Club members during the latter years of the club, Silverfern began raising concerns with Citi about the decline in investor participation in Equity Club deals (see JX-102; Tr 131:4-12, 217:6-10, 924:23-925:3, 927:11-20).[FN11]
In its presentation, Silverfern outlined to O'Donnell its theories on the Equity Club's "recent[] struggle[s]" and "underperformance," as well as potential paths forward (JX-102 at SF0463656-661). Although O'Donnell offered his belief that investors were "full up with private equity," he agreed to investigate further (Tr 927:10-928:13). Neither O'Donnell nor Locke (who was also in attendance) mentioned the April 2016 Letter during the meeting (Tr 929:1-4). Whether O'Donnell investigated the matter further, or, if he did, whether he learned anything from such an investigation, is unclear from the record (see Tr 935:15-18).
The Equity Club later expired by its terms on May 2018 (pltfs proposed FOF ¶ 6; dfts proposed FOF ¶ 6). Two months later, on July 6, 2018, Silverfern made a payment to Citi for certain fees owed under the Agreement through Q4 2017 (pltfs proposed FOF ¶ 19; dfts proposed FOF ¶ 21), but additional fees remained outstanding (JX-116 at Citi_157754-755). [*10]Silverfern has, to date, made no further payments of fees to Citi in connection with the Equity Club (see pltfs proposed FOF ¶ 20; dfts proposed FOF ¶ 22).
The reason for Silverfern's non-payment first became apparent at an October 2018 meeting between Silverfern and Citi. During that meeting, Citi addressed its concerns regarding Silverfern's late payment (see Tr 143:3-13). Silverfern responded by communicating that it would not be paying Citi's fees in light of its position that Citi had not performed its obligations as Placement Agent under the Agreement (Tr 143:13-15, 936:6-21). The parties thereafter had follow-up discussions on the issue during meetings held on November 14, 2018, and December 6, 2018, respectively (see DX-232; Tr 937:9-939:4). Eventually, on February 7, 2019, Citi delivered a demand letter to Silverfern for any unpaid fees due under the Agreement (DX-296; Tr 941:23-942:6). Although the letter did not specify the specific amount purportedly due to Citi (see DX-296), the parties have since stipulated that the amount of fees due to Citi if it prevails in this action would be $8,853,952, exclusive of prejudgment interest and fees, which includes (1) $5,254,663.00 in Citi Placement Fees through Q2 2024, and (2) $3,559,290.00 in Citi Incentive Fees through Q2 2024 (JX-121 ¶¶ 1-2). Conversely, if Silverfern prevails, the parties stipulated that Silverfern is entitled to recoup $2,554,652.00 in Silverfern Placement Fees (id. ¶ 3).
CONCLUSIONS OF LAW
As both Citi and Silverfern assert a breach of the Agreement, each must establish, through a preponderance of the evidence, the following four well-established elements to prevail on their respective claims: "the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages" (Harris v Seward Park Hous. Corp., 79 AD3d 425, 426 [1st Dept 2010]). However, the primary issue that the court must answer to resolve the parties' dueling claims is a fairly straightforward one: did Citi materially breach the Agreement by virtue of its transmittal of the April 2016 Letter and its subsequent performance as Placement Agent in the months and years that followed (see NYSCEF # 419 — SF br ¶¶ 52-90; NYSCEF # 420 — Citi br ¶¶ 119; NYSCEF # 423 — SF reply 4-19; NYSCEF # 425 — Citi reply at 3-17).
If Citi did breach, Silverfern maintains, then any further performance by Silverfern—including, as is relevant here, its payment of outstanding Incentive Fees and Placement Fees that may be due and owing to Citi—was excused and Silverfern is instead entitled to the damages caused by Citi's conduct (see SF br ¶¶ 82-90; SF reply at 4, 13-17). On the other hand, if Citi did not breach the Agreement, both parties essentially agree that Silverfern did not perform under the Agreement by refusing to pay to Citi all fees owed under the Agreement (Citi br ¶¶ 116-142; Citi reply at 16-17; SF br ¶¶ 6-7, 53 & n16).
Given the importance of determining whether Citi breached of the Agreement in light of its direct impact on its own breach of contract claim, the court begins its analysis with Silverfern's counterclaim against Citi.
I. Silverfern's Breach of Contract Counterclaim
Silverfern's breach-of-contract counterclaim ultimately rests on the following three theories: (1) Citi breached Section 1(c)(A) by sending the April 2016 Letter without first obtaining Silverfern's prior written consent; (2) Citi breached its best-efforts obligation under Section 1(c) by sending the April 2016 Letter, sending subsequent communications to Citi bankers and investment counselor directing them "not to meet" with Silverfern, and hiding the existence of the April 2016 Letter; and (3) Citi breached its best-efforts obligation by failing to provide appropriate banker support for the Equity Club. As explained below, none of these bases [*11]are supported by a preponderance of the evidence and credible testimony adduced at trial.
A. Citi Did Not Breach Section 1(c)(A) of the Agreement
Silverfern first asserts that Citi breached the Agreement when it sent the April 2016 Letter without first obtaining Silverfern's prior written consent (SF br ¶¶ 54-59; SF reply at 4-7). Silverfern points to Section 1(c)(A) of the Agreement, under which Citi and its employees were prohibited from providing Equity Club members with "any Partnership Documents" or "other information relating to any Investment Partnership or any Transaction" without Silverfern's prior written consent (Agreement § 1[c][A]). Silverfern maintains that the April 2016 Letter fell squarely within the ambit of this provision because it concerns "Investment Partnerships" and/or "Transactions" (see SF br ¶ 59; SF reply at 5-7). Applying the well-settled principles of contract interpretation, the court disagrees.
Under New York law, "a contract is to be construed in accordance with the parties' intent" (MHR Capital Partners LP v Presstek, Inc., 12 NY3d 640, 645 [2009]). And the "best evidence of what parties to a written agreement intend is what they say in their writing" (Slamow v Del Col, 79 NY2d 1016, 1018 [1992]). Indeed, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms" (W.W.W. Assoc., Inc. v Giancontieri, 77 NY2d 157, 162 [1990]). Here, there is no dispute that under the Agreement, an "Investment Partnership" constitutes a "single-purpose limited partnership[]" formed by Silverfern (Agreement at WHEREAS[A]), while "Transaction" is a "transaction (or series of related transactions) with respect to a private equity or similar co-investment opportunity" in which the aforementioned "Investment Partnership" will "invest alongside certain private equity firms and/or other capital sources" (id.). If that was all that was written in the Agreement in connection with these terms, perhaps Silverfern's position that the April 2016 Letter is covered by Section 1(c)(A) would hold water. The well-established principles of contract interpretation, however, dictate that the terms "Investment Partnership" and "Transaction" must be read within the context of the entire Agreement (see Global Reins. Corp. of Am. v Century Indem. Co., 30 NY3d 508, 518 [2017] ["[t]he agreement should be 'read as a whole, and every part will be interpreted with reference to the whole'"]). It is that added, but necessary, context that ultimately defeats Silverfern's interpretation of Section 1(c)(A).
Under the Agreement, the parties contemplated that the "single-purpose limited partnerships" would be formed by Silverfern "[i]n accordance with the terms and conditions of th[e] Agreement," which was, as the parties agree throughout the Agreement, establishing the key parameters of Silverfern's offering of investment opportunities to Citi's clients to acquire Class B Interests in these "Investment Partnerships" through the Equity Club (see Agreement at WHEREAS[A]-[D]). The parties also later agreed that the "Investment Partnerships" referenced in the Agreement would become "a party to th[e] Agreement" upon being distributed to the Class B Interests under the Equity Club (see id. at WHEREAS[D] & Annex 1). Thus, as these additional contractual provisions aptly demonstrate, the Equity Club undoubtedly held a central role in the respective definitions of the terms "Investment Partnerships" and "Transactions" within the context of the entire Agreement (Agreement at WHEREAS[A]-[D] & §§ 1-3). For this reason, the only reasonable conclusion upon reading the entire Agreement is that, when defining the terms Investment Partnership and/or Transaction, the parties only intended to capture those investment vehicles and transactions specifically offered to Equity Club members as part of the Equity Club. Consequently, by requiring Silverfern's "prior written consent" before Citi could provide "other information relating to any Investment Partnership or any Transaction" [*12]under Section 1(c)(A), the parties only contemplated those situations in which Citi was planning to circulate documents and correspondence relating to specific deals and investment vehicles that were offered or marketed in connection with the Equity Club.[FN12]
Nothing in the Agreement supports a broader interpretation of the terms "Investment Partnerships" and "Transactions."
Given this analytical framework, it is evident that the preclearance obligation of Section 1(c)(A) did not apply to April 2016 Letter. It is true, of course, that the April 2016 Letter was written to Citi clients in their capacity as Equity Club members who had existing investments with the Equity Club (see April 2016 Letter at Citi_0000001). But the letter is equally clear that its purpose was to notify these clients about products were unrelated to the "Silverfern Contract" into which each Equity Club member entered with Silverfern in order to join the Equity Club (see April 2016 Letter at Citi_0000001). Hence, by writing about these "Additional Products," Citi was not "provid[ing] Equity Club Investor[s]" with "other information relating to any Investment Partnership or any Transaction" as defined under the Agreement (Agreement § 1[c][A]).
The evidence and testimony at trial overwhelmingly supports this conclusion. For example, when provided a copy of the April 2016 Letter, Citi bankers and investment counselors were told that the letter addressed "the fundraising of Silverfern Investment Partners II, L.P." (JX-088). Yet as Silverfern and Citi both agree, neither this fund nor the SMA/RSMA were being offered through the Equity Club (see Tr 107:1-2, 894:10-12, 955:1-7). Consequently, even if the term "Additional Products" more explicitly referenced "Silverfern Investment Partners II, L.P." or the SMA/RSMA, Citi understood that it was not writing to its clients about one of the single-purpose investment partnerships being formed for the Equity Club members' investments or the corresponding co-investment opportunities into which they would be investing. This understanding was repeatedly and credibly corroborated by Citi witnesses, almost all of whom testified that they understood the April 2016 Letter to reference products offered outside of the Equity Club (Tr 193:24-194:13, 355:6-23, 439:12-17, 729:15-17).
In sum, Silverfern has failed to establish by a preponderance of the evidence that the April 2016 Letter breached Section 1(c)(A) of the Agreement.[FN13]

B. Citi Did Not Breach Its Best-Efforts Obligation to Silverfern
The next theory advanced by Silverfern in support of its breach of contract claim is that that Citi breached its best-efforts obligation under Section 1(a) of the Agreement (see SF br ¶¶ 60-65; SF reply at 7-10). In general, a "best efforts clause imposes an obligation to act with good faith in light of one's own capabilities" and pursue "all reasonable methods" to do so (Maestro W. Chelsea SPE LLC v Pradera Realty Inc., 38 Misc 3d 522, 530 [Sup Ct, NY County 2012]). To assist with this analysis, there must be "objective criteria" against which a party's efforts can [*13]be measured" (see Timberline Dev. LLC v Kronman, 263 AD2d 175, 178 [1st Dept 200]). Even so, such clauses typically permit parties a "degree of discretion in the selection of a plan of action and allows them to rely on their good faith business judgment as to the 'best way' to achieve the desired result (see Digital Broadcast Corp. v Ladenburg, Thalmann & Co., Inc., 2008 WL 5427239, at *9 [Sup Ct, NY County, Dec. 11, 2008], affd 63 AD3d 647 [1st Dept 2009]).
The source of Citi's best-effort obligations in this case can be found at Section 1(a) of the Agreement, which provides that Citi, as Placement Agent, is required to use "best efforts to offer the Class B Interests to the Equity Club" (Agreement § 1 [a] [ii]). Although the term "best efforts" is not specifically defined, Section 1(c) requires Citi to undertake specific tasks in support of the Equity Club that, when read in conjunction with Section 1(a), essentially define the specific tasks delineating the contours of Citi's best-effort obligation (see Citigroup Global Mkts. Inc. v SCIP Cap. Mgt., LLC, 225 AD3d 420, 421 [1st Dept 2024] [holding that "Section 1(a)(ii) of the Distribution Agreement, which contains that obligation, should be read in conjunction with section 1(c), which lists specific tasks Citi is supposed to perform"]). Those tasks included, among other things, facilitating distribution of Partnership Documents, arranging presentation meetings between Equity Club investors, assisting in the placement of Class B Interests with Equity Club members, and obtaining Silverfern's prior written consent to circulated certain types of documents and communications (see Agreement § 1 [c]).
Silverfern, in essence, advances three reasons to conclude that Citi breached its best-efforts obligation under the Agreement. First, Silverfern asserts that Citi's transmittal of the April 2016 Letter constituted a breach of its best-efforts obligation on its own (SF br ¶¶ 60-65; SF reply at 7-10). Second, Silverfern contends that Citi's emails to Citi's Asia-based bankers and investment counselors regarding their ability to attend meetings with Silverfern in connection with the SMA/RSMA constituted an independent breach of Citi's best-efforts obligation (SF br ¶¶ 62-63). Finally, Silverfern argues that Citi breached its best-efforts obligation by sharply reducing their efforts to support the Equity Club following the transmittal of the April 2016 Letter (SF br ¶¶ 62, 66-70; SF reply at 10-13). The court considers each of these contentions below. As explained, none of them are supported by the record.
1. Citi's Transmittal of the April 2016 Letter Did Not Breach Its Best-Efforts Obligation
At the outset, Silverfern argues that Citi materially breached its best-effort obligations to Silverfern by sending the April 2016 Letter and then "concealing" it from Silverfern (SF br ¶¶ 60-65; SF reply at 7-10). In so arguing, Silverfern essentially asks the court to infer a nefarious intent underlying Citi's circulation of the letter in light of the purported concern Citi employees expressed about Silverfern's marketing of the SMA/RSMA (see SF reply at 7-9). But neither the evidence nor the credible testimony adduced at trial supports such a conclusion.
As Citi's witnesses repeatedly testified, and contemporaneous evidence confirms, the general purpose of sending the April 2016 Letter was to head-off potential regulatory concerns (particularly in the Asia-Pacific region) and clarify any confusion, both internally and externally, in connection with Silverfern's official launch of the RSMA/SMA product (see Tr 107:1-2, 120:17-21, 461:21-23, 508:25-509:4, 564:8-11, 581:7-11JX-078 at Citi_0112521; JX-088 at Citi_0000005; PX-277 at SF00348958; see also JX-049 at Citi_0154344; Tr 894:10-12, 1048:13-1049:5). The April 2016 Letter accomplished this goal. It (1) reminded clients that the [*14]Equity Club remained active and ongoing, (2) explained that Silverfern was in the process of marketing additional products outside of the Equity Club, (3) clarified that Citi would have no involvement in these offerings (notwithstanding any fees to which it may be entitled), and (4) directed clients to contact Citi and Silverfern with any questions they may have (JX-087 at Citi_0000001-002). Citi also accurately articulated its role (or lack thereof) in the SMA/RSMA so as to ameliorate these various concerns and additional sources of confusion (see Tr 118:1-16). In making these representations, Citi remained factual in its approach and stayed clear of any disparagement of Silverfern or its non-Equity Club products. All in all, nothing in the April 2016 Letter ran afoul of Citi's best-efforts obligation delineated under the Agreement. Rather, it was plainly consistent with the "degree of discretion" accorded to Citi to exercise "good faith business judgment" in performing its contractual obligations (see In re Chateaugay Corp., 186 BR 561, 594-595 [Bankr SD NY 1995], affd 198 BR 848 [SDNY 1996], affd 108 F3d 1369 [2d Cir 1997]).
The trial record is devoid of any evidence or testimony to support a different conclusion. As an initial matter, Silverfern failed to adduce any evidence of malicious intent or nefarious objective to "taint" investor attitudes.[FN14]
Silverfern likewise failed to establish how anything in the April 2016 Letter was false, misleading, or inaccurate about the letter (see SF reply at 8-9). For instance, Silverfern takes issue with the fact that Citi represented that it had not conducted any diligence Silverfern's Additional Product because Citi did not conduct diligence on any of the deals offered as part of the Equity Club (SF Br ¶ 30). But Citi's statement here was accurate. By the time Silverfern began formally marketing its SMA/RSMA, Citi had not yet approved it for its platform through the normal Citi diligence process and therefore had not signed-off on its final terms (see Tr 111:22-25; cf. DX-021 at Citi_0126583-584; PX-210 at Citi_0067263; PX-218; PX-235).
Separately, although the April 2016 Letter may not have specifically expanded on the scope of the term "Additional Products," the overwhelming majority of testimony adduced at trial establishes that neither Citi's employees (see Tr 194:3-13, 355:6-23, 439:12-17, 729:15-17) nor its clients (see Tr 322:7-8, 420:3-5, 466:13-16, 514:9-11, 653:3-12) were confused. And for its part, Silverfern can only point to discrete instances of "confusion" that were either largely unrelated to the contents of the April 2016 Letter or isolated in nature (cf. JX-098 at Citi_0080707 [identifying a Citi employee was who unsure if a specific product offering fell within the Equity Club]; DX-192 [client was confused as to whether declining to participate in the RSMA impacted the ability to see future Equity Club deals][FN15]
; DX-290 at Citi_0025883 [Citi employee was unsure if Equity Club remained open to new members]; DX-220 at Citi_0080539 [*15][Eighteen months after the initial sending of the April 2016 Letter and after almost six months had passed since Silverfern's last investment opportunity offering, one Citi employee was unsure if Silverfern and Citi were still in a partnership]). But these stray instances of purported confusion, however, do not establish that the April 2016 Letter caused any of this apparent confusion.
Finally, the record lacks any support for the proposition that Citi actively concealed the April 2016 Letter from Silverfern. Rather, Citi clearly directed the letter's recipients to "please contact the Silverfern representative who has or will reach out to you regarding the offering of [Additional Products]" (April 2016 Letter at CITI_0000002). Even if Silverfern never received any direct inquiries regarding the letter immediately following its transmittal (see Tr 998:7-16, 998:25-999:8), Citi's explicit directive establishes that, far from suppressing any evidence of the letter, Citi actively encouraged outreach to Silverfern. And although Citi may not have specifically disclosed the April 2016 Letter to Silverfern, the record confirms that it did directly communicate the same messaging evident from the letter, i.e., that Citi did not have anything to do with the SMA/RSMA (see PX-466 at SF00169135-136; see also Tr 993:24-996:21). At any rate, as noted above, Citi was not required to obtain Silverfern's pre-clearance under the Agreement (Agreement § 1 [c] [A]), so there was also no contractual reason for Citi to disclose this otherwise routine letter to Silverfern.
To rebut this evidentiary record, Silverfern chiefly relies on the opinion of its expert, Daniel Strachman, to maintain that the Letter was inconsistent with Citi's best-efforts obligation (see DX-255 ¶¶ 5-9, 153-162: SF br ¶¶ 33-34). Strachman's opinion regarding the contents of the April 2016 Letter, however, is ultimately unpersuasive. In his report, Strachman, relying on his professional experience, characterizes the April 2016 Letter as somehow communicating that Citi had "lost confidence in Silverfern and was distancing itself from Silverfern" (DX-255 ¶ 156). Strachman then doubled down on this characterization during trial, testifying that, in his view, the letter was a "shocking document" that "basically says that Citi no longer wants to work with Silverfern, doesn't trust Silverfern, basically tells investors that they shouldn't be doing business with Silverfern" (Tr 1106:14-1107:19). It is frankly unclear what letter Strachman reviewed because, put bluntly, nothing in the April 2016 Letter suggests that Citi communicated, either explicitly or implicitly, any of these damning sentiments to its clients. Rather, as explained above, the April 2016 Letter simply clarified—in a clear and objective manner—the nature of Silverfern's additional products being offered outside the Equity Club.
In short, the April 2016 Letter did not breach Citi's best-efforts obligation under the Agreement
2. Citi's Subsequent Communications to Its Employees About Silverfern Did Not Breach Its Best-Efforts Obligation
Silverfern next argues that Citi breached its best-effort obligation by communicating to its Asia-based bankers and investment counselors in June 2016 and July 2017 that they should "not to meet" with Silverfern (SF br ¶¶ 62-63). In these communications, Citi employee Marc Rucinski communicated to Citi's bankers in the Asia-Pacific region that "due to increased regulatory risk associated with Silverfern's launch of new products that are not on" CPB's platform, "Clive Holmes and other representatives from Silverfern will no longer be invited to come to Asia by [CPB] to meet with [CPB's] clients" (JX-096 at Citi_0085489). In Silverfern's view, these communications caused bankers to "question" and "doubt" Citi's support of [*16]Silverfern in direct contravention of Citi's best-effort obligations to support Equity Club Deals (see id. ¶ 63). Again, Silverfern's contention is belied by the documentary and testimonial record adduced at trial.
As articulated in these communications, the reason that Citi bankers and investment counselors could not invite Silverfern's representatives to meet with clients in the Asia-Pacific region was due to the "regulatory risks associated with Silverfern's launch" of the SMA/RSMA (JX-096 at Citi_0085489; DX-215). These were, of course, the same regulatory concerns about which Citi employees were already aware and that had been communicated to Silverfern at multiple points throughout the life of the Equity Club (see PX-006 at SF00023588; PX-044 at SF00344233-234; PX-283 at Citi_0149333; PX-277 at SF00348958; Tr 977:12-979:5, 1048:13-1049:5). Silverfern therefore cannot seriously claim that Citi's communication was sent in bad faith or to otherwise undermine confidence in Silverfern.
More critically, nothing in these emails directed Citi bankers to alter how they performed their obligation under the Agreement, nor does anything in the record suggest that these emails had such a practical impact (see generally JX-096). There is also no reason to conclude that these communications prevented clients from meeting directly with Clive Holmes. Quite the contrary. As both his testimony and contemporaneous evidence established, even after Citi circulated the June 2016 and July 2017 emails, Holmes continued to meet with Equity Club members during his trips to the Asia-Pacific region (see Tr 984:19-989:12; PX-402 at SF00412894; PX-707 at SF00411208; PX-785 at SF00423576-578).
Silverfern's expert, Daniel Strachman, fails to alter this conclusion. In opining that Citi's June 2016 and July 2017 breached Citi's best-efforts obligation, Strachman opines that Citi's emails, through their "sharp tone," were "not consistent with its best efforts obligation" and were "needlessly adversarial toward Silverfern," in turn "clearly impl[ying] that Citi had no interest in supporting the Equity Club" (DX-255 ¶¶ 165). Again, Strachman's opinion distorts the factual record. To reiterate, Citi communicated a longstanding regulatory concerns based on Silverfern's pursuit of new products that were unrelated to the Equity Club. And it otherwise avoided requiring, either explicitly or implicitly, any change in how Citi's bankers and investment counselors performed their duties in connection with the Equity Club (cf. JX-096 [accurately noting that bankers and investment counselors that if their clients were meeting with Silverfern in connection with the SMA/RSMA, those products were not part of the Equity Club]). Thus, in the court's view, nothing in these communications were "needlessly adversarial."
All in all, in view of the above, there is no basis to conclude from the record that the either the June 2016 or July 2017 emails to Citi's Asia-Pacific bankers and investment counselors breached Cit's best-efforts obligation to Silverfern.
3. Citi Bankers' Support of the Equity Club Following the April 2016 Letter Was Consistent with Its Best-Efforts Obligation
Silverfern's final contention is that Citi breached its best-efforts obligation by failing to provide appropriate banker support for the Equity Club during the duration of the Agreement (SF br ¶¶ 62, 66-70; SF reply at 10-13). Specifically, Silverfern contends, after Citi sent the April 2016 Letter, its bankers and investment counselors' support of the Equity Club "fell off a cliff" (SF br ¶ 66; SF reply at 11-13). As explained below, upon consideration of all evidence and credible testimony offered at trial, the record is clear: Citi continued to exercise its best efforts to support the Equity Club throughout the entirety of the Club's existence.
To start, there is no serious dispute that in the initial years of the Equity Club, Citi's [*17]bankers and investment counselors received training about the Equity Club (Tr 50:4-16, 267:18-270:10, 385:2-10, 681:14-682:5). And even if these bankers and investment counselors did not receive copies of the Agreement (see Tr 64:5-13), the court credits the testimony adduced at trial that indicated that these trainings effectively communicated clear best-effort expectations about how Citi employees should conduct themselves in connection with the Equity Club (see Tr 60:18-61:13, 128:11-17, 269: 3-5, 272:9-274:17, 454:13-455:4, 491:7-22, 639:19-641:1, 690:22-691:7). With this training in place, Citi's bankers and investment counselors then went on to facilitate and promote the Equity Club and Silverfern's deals in a manner that was consistent with the obligations set forth in the Agreement (see PX-014 at Citi_0058786-788; PX-057 at SF00039357-358; PX-070 at SF00328246; PX-084 at SF00246280-282; Tr 231:21-25, 888:11-890:1). Notably, deal participation rates in the Equity Club's initial offerings—and thus, logically, Citi's performance of its duties—were much to Silverfern's satisfaction (see Tr 4:22-25, 889:1-890:1).
Nothing about the April 2016 Letter changed Citi's approach—a point to which Citi's witnesses almost uniformly, and credibly, testified during trial (see Tr 322:2-21, 420:3-16, 492:10-15, 522:7-11, 653:16-22, 698:3-25). The evidentiary record adduced at trial, was in accord. Even after the April 2016 Letter, Citi bankers continued to facilitate communications between Equity Club members and Silverfern and ensure that the latest investment opportunities were presented to Equity Club members in a manner that was consistent with pre-letter interactions [FN16]
(see PX-379 at Citi_0027139; PX-386 at Citi_0028579; PX-392 at Citi_0027605; PX-393 at Citi_0026613; PX-447 at Citi_0020950-954; PX-659 at Citi_0021924-925; PX-423 at Citi_0112552; PX-428 at Citi_0020316; PX-429 at Citi_0020859; PX-436 at Citi_0019386; PX-454 at Citi_0019472; PX-431 at Citi_0044621-504 at SF00096861; PX-517 at Citi_0029365-367; PX-518 at Citi_0022401; PX-534 at SF00007443-444; PX-567 at Citi_0000570; PX-572 at Citi_0156952; PX-629 at Citi_0034827-828; PX-659 at Citi_0021924; PX-670 at Citi_0131341; PX-690 at SF00329501).[FN17]
Notably, contemporaneous behavior suggests that Silverfern seemingly had no issue with Citi's performance of its obligations of the Equity Club following the April 2016 Letter given its unilateral renewals of Agreement during a time in which Citi's performance purportedly "fell off a cliff" (see JX-091; dfts proposed FOF ¶ 6).
To rebut this evidence and testimony, Silverfern largely relies on the quantitative analysis [*18]of its expert, Daniel Strachman. In his report, Strachman observed that during the period after Citi sent the April 2016 Letter, Citi bankers sent fewer emails to clients, had fewer contacts and communications about Equity Club deals, participated in fewer Silverfern conference calls to solicit information about Equity Club deals, and less frequently accessed the data rooms regarding Equity Club deals (DX-255 ¶¶ 121-172). Strachman largely reiterated those observations during his direct examination (see Tr 1101:25-1102:9, 1110:23-1111:5).
However, when pressed by Citi's counsel, the persuasive value of Strachman's methods and conclusions unraveled. For example, during cross examination, it became clear that, among other things:
(1) Strachman's analysis did not consider whether the bankers he analyzed constituted a representative sample (see Tr 1146:4-8);
(2) Strachman did not account for the fact that that one of the five bankers analyzed in his dataset had left Citi during the relevant period of time (see Tr 1144:2-25; PX-629);
(3) Strachman did not consider that certain Equity Club members left the Equity Club to join the RSMA (see Tr 1145:1-7; DX-234);
(4) Strachman's analysis did not weigh the alternative reasons offered by Equity Club members for why they were not participating in Equity Club deals (see Tr 1145:14-21);
(5) Strachman did not necessarily account for all emails that may have been sent and received by Citi in connection with any given Equity Club deal (see Tr 1140:21-1143:7);
(6) despite his conclusion that no meetings occurred following the April 2016 (see DX-255 ¶ 142), Strachman did not consider that there were meetings that occurred between Citi and Equity Club members that were not necessarily logged by Citi employes (Tr 1148:5-1151:21);
(7) despite his conclusion that conference call participation dropped after the April 2016 Letter (DX-255 ¶ 150), Strachman failed to distinguish between Citi's participation and the participation of all other stakeholders (Tr 1161:1-1162:3); and
(8) despite his conclusion that there was a "sharp decline" in data room access following the April 2016 Letter, Strachman did not always consider the nature of the post-April 2016 Letter Equity Club deals, Citi's role vis-à-vis Equity Club members in connection with the Equity Club, or whether any of the five bankers analyzed in his report had other members of their team accessing the data room (see Tr 1154:5-14, 1157:2-1159:7).
Furthermore, in addition to these discrepancies, Strachman's analysis also improperly assumed that Citi had a more involved role in the Equity Club as Placement Agent than it actually did (compare DX-255 ¶¶ 33-34, 61-62, and Tr 1121:14-23 with PX-707 at SF00411208, and Tr 988:9-21). Consequently, although Strachman's opinion was unrebutted and his report was enough to defeat Citi's motion for summary judgment (see NYSCEF # 319), upon consideration of the full record adduced a trial, Strachman's analysis offers minimal persuasive value in assessing Citi's compliance with its best-effort obligations following the April 2016 Letter (Sagarin v Sagarin, 251 AD2d 396, 396 [2d Dept 1998] ["The credibility of the valuation experts and the appropriate weight to be accorded to their respective testimony were matters to be resolved by the trial court, sitting as the finder of fact"]). Indeed, even acknowledging the declines identified by Strachman in his analysis, Strachman's opinion ultimately fails to meaningfully persuade the court that such declines were a result of Cit's purported lack of compliance with its enumerated best-efforts obligation as opposed to other extraneous factors.
* * *
In sum, Silverfern has failed to establish that Citi breached any of its obligations to Silverfern under the Agreement. To the contrary, the record adduced is abundantly clear: Citi performed under the Agreement at all relevant times. Thus, Silverfern has failed to prove its breach of contract counterclaim by a preponderance of the evidence and its claim is dismissed with prejudice.[FN18]

II. Citi's Breach of Contract Claim
Citi has sufficiently established, by a preponderance of the evidence, all elements of its breach of contract claim. There is no dispute that the Agreement is enforceable, and for the reasons that were articulated above, Citi plainly performed under the agreement by, among other things, meeting its best-efforts obligation throughout the life of the Equity Club. Meanwhile, Silverfern has already conceded that it did not perform under the Agreement by failing to pay those outstanding Placement Fees and Incentive Fees to which Citi is entitled (see pltfs proposed FOF ¶ 20; dfts proposed FOF ¶ 22; see also JX-116 at Citi_157754-755). And its failure to perform clearly damaged Citi (see Moelis & Co. LLC v Ocwen Fin. Corp., 203 AD3d 469, 471 [1st Dept 2022] [affirming judgment granting claim for breach of contract based on claim for failure to pay transaction fee]). Finally, the parties have stipulated that the damages to which Citi is entitled is $8,853,952, exclusive of prejudgment interest and fees, which includes (1) $5,254,663.00 in Placement Fees, and (2) $3,559,290.00 in Incentive Fees (JX-121 ¶¶ 1-2).
Separately, under Section 10(a) of the Agreement, "in the event of litigation between one or more Silverfern entities, on the one hand, and one or more Citibank Entities, on the other hand, the losing party shall reimburse the prevailing party for all legal fees and disbursements of the prevailing party's counsel" (Agreement § 10 [a]). Because the court has concluded that Citi is entitled to judgment on its breach of contract claim and that Silverfern's breach of contract counterclaim should be dismissed, Citi has prevailed with respect to "central relief sought" and is the prevailing party in this action (see Wiederhorn v Merkin, 98 AD3d 859, 863 [1st Dept 2012] ["The party who prevails with respect to 'the central relief sought' is considered the prevailing party"]). Therefore, Citi is entitled to its counsel's legal fees and disbursements under the Agreement in an amount to determined based on additional submissions.
CONCLUSION AND ORDER
For the foregoing reasons, the court holds that (1) plaintiffs/counterclaim-defendants Citigroup Global Markets, Inc., Citigroup Global Markets Limited, Citigroup Global Markets Asia Limited, Citigroup Global Markets Singapore Pte Limited, Citibank, N.A., New York Branch, Citibank, N.A., London Branch, Citibank, N.A., Zurich Branch, Citibank, N.A., Geneva Branch, Citibank, N.A., Singapore Branch, Citibank, N.A., Hong Kong Branch, Citibank, N.A., Jersey, Channel Islands Branch, Citibank International plc, Citibank (Switzerland) AG, Citibank Canada Investment Funds Limited, Cititrust (Bahamas) Limited, and Citibank, N.A. (collectively Citi) has established their entitlement to judgment on their breach of contract claim and (2) defendants/counterclaim-plaintiffs SCIP Capital Management, LLC and the Silverfern Group, Inc. (together, Silverfern) have failed to establish their breach of contract counterclaim.
Accordingly, it is hereby
ORDERED that the Clerk of the Court is directed to enter judgment in favor of Citi and against Silverfern in the amount of $8,853,952 plus pre-judgment interest at the statutory rate of 9% per annum, as calculated by the Clerk of the Court, together with costs and disbursements to be taxed by the Clerk upon submission of an appropriate bill of costs; and it is further
ORDERED that the Clerk of the Court is directed to enter judgment dismissing, with prejudice, Silverfern's counterclaim for breach of contract against Citi; and it is further
ORDERED that Citi shall submit a proposed judgment to the Clerk of the Court consistent with this Decision after Trial, together with a detailed affirmation demonstrating its proposed calculation of prejudgment interest; and it is further
ORDERED that Citi is entitled to an award from Silverfern of attorneys' fees and expenses incurred in an amount to determined based on additional submissions, and this issue is hereby severed for an inquest before a Special Referee to determine the amount of fees and costs to be awarded; and it is further
ORDERED that within 30 days of the filing of the Note of Issue with Notice of Inquest, counsel for plaintiff shall serve a copy of this Order with Notice of Entry, the Note of Issue with Notice of Inquest, and a completed Information Sheet, upon the Special Referee Clerk in the General Clerk's Office (Room 119), who is directed to place this matter on the calendar of the Special Referee's part; and it is further
ORDERED that such service upon the Special Referee Clerk shall be made in accordance with the procedures set forth in the Protocol on Courthouse and County Clerk Procedures for Electronically Filed Cases (accessible at the "E-Filing" page on the court's website at the address www.nycourts.gov/supctmanh); and it is further
ORDERED that counsel for Citi is directed to serve a copy of this order, together with notice of entry, upon defendant and the Clerk of the Court within 10 days of this order.
DATE 2/27/2025
MARGARET A. CHAN, J.S.C.

Footnotes

Footnote 1:As relevant here, Class B Interests constituted those opportunities to acquire interests in "each Investment Partnership" that was offered by Silverfern to CPB investors who were not pre-existing Silverfern investors (i.e., CPB investors) (Agreement at Recital C; Tr 56:21-57:4). By contrast, Class A Interests under the Equity Club comprised of "preexisting Silverfern clients" (Tr 57:7-10, 875:2-5).

Footnote 2:As witnesses largely testified to during trial, this provision meant that Silverfern could also market products to Equity Club members even if not being offered on Citi's platform (see Tr 73:13-74:11, 565:20-566:3, 880:23-881:18). Even so, such an offering would not have been approved by Citi and therefore could not made as part of the Equity Club (see Tr 170:2-172:9).

Footnote 3:Through an SMA, investors could participate in a "blind pool" in which their commitments are aggregated and then deployed by the manager in its discretion, such that each participating investor would invest in every deal (see Tr 105:19-23, 891:24-9).

Footnote 4:Club (JX-047 at Citi_0205799). That real estate component received approval by both AIOC and DPAC in September 2014 (see PX-210 at Citi_0067263). Thereafter, Silverfern began offering real-estate-centric deals to the Equity Club (see PX-218; PX-235).

Footnote 5:In its papers, Citi characterizes the RSMA (i.e., Retail Separately Managed Account) as a separate product from Silverfern's SMA. But during his testimony, Clive Holmes explained that they are the "same product," with their respective sizes being the "only difference" (Tr 899:21-900:8). Holmes clarified that the RSMA required a minimum investment commitment between $5 million and $15 million, while the SMA required a commitment of $15 million and above (see Tr 900:1-6).

Footnote 6:At trial, Citi witness Jeffrey Locke acknowledged that Silverfern had the right to market products outside of the Equity Club to Equity Club members (see Tr 564:25-565:7, 565:19-566:3). But as he credibly testified, he was still concerned because Silverfern's SMA product was not approved for Citi's platform and therefore Citi did not have any information about this product being offered to its clients (Tr 565:8-12). In the court's view, this was reasonable concern given the existence of potential regulatory concerns and the potential impact on Equity Club members' status as club members upon signing up for the SMA/RSMA (see Tr 113:2-10, 565:13-15).

Footnote 7:In one email exchange, dated October 13, 2016, a Citi employee, Mercedes Garcia-Ayuso, inquired with Mr. Locke about whether Citi clients can still "join the club," while also noting her understanding that "a second club recently launched" (DX-290 at Citi_0025883). But nothing in her email suggests that she questioned the ongoing validity of the Equity Club. Similarly, in a September 6, 2017 email responding to a scheduling email from Mr. Holmes to a Singapore-based client, Citi employee Jennifer Tay asked to confirm if Citi was "no longer in partnership with [Silverfern]" (see DX-220 at Citi_0080539). At this point, over 18 months had passed since the April 2016 Letter was circulated, and almost six months had passed since Silverfern's last investment opportunity offering (see DX-234 at "Time Order Equity Club Summary" tab, rows 1-2, cols T-U).

Footnote 8:Mr. Locke circulated a similar email on the following year on July 11, 2017 (DX-215).

Footnote 9:Although Mr. Holmes testified that his relationship with Equity Club members had deteriorated (see Tr 918:12-920:20), his later testimony, as well as contemporaneous communications, establish that he actually continued to meet with Asia-Pacific-based investors—including those who had purportedly ceased communications with him—in the years following the April 2016 Letter (see Tr 984:19-989:12; PX-402 at SF00412894; PX-707 at SF00411208; PX-785 at SF00423576-578).

Footnote 10:Notably, when one member was confused about the Equity Club's status, Citi clarified that the Equity Club was still operational (see e.g. DX-192 at Citi_0016911; see also JX-098 at Citi_0080705 ["Other clients still do have interest in seeing club transactions and are participating"]).

Footnote 11:Just a month prior, Mr. Holmes had held a meeting with a Citi banker during which the parties discussed Silverfern's deteriorating relationship with Citi (see e.g. JX-100 at Citi_0141282).

Footnote 12:Such an interpretation makes sense given that Citi employes were otherwise prohibited from giving opinions and recommendations on the merits of the co-investment opportunities offered as part of the Equity Club (see JX-037 at Citi_0008653).

Footnote 13:Although Section 1(c)(A)'s restrictions also apply to "Partnership Documents," i.e., offering materials, partnership agreements, and subscription agreements, (Agreement §§ 1[c][ii] & [c][A]), Silverfern does not seriously suggest that the April 2016 Letter falls within this definition.

Footnote 14:Even if certain unidentified Citi employees in the Asia-Pacific region apparently expressed sentiments that, for example, Silverfern "need[ed] to be put in line" and "the relationship needs to be severed" (see DX-169 at Citi_0150227), nothing in April 2016 Letter remotely suggested to Equity Club members that Citi harbored such feelings towards Silverfern.

Footnote 15:Such client confusion was unsurprising given the nature of Silverfern's communications to Equity Club members about the potential impact of the SMA/RSMA on future Equity Club membership (see JX-073 at SF0369067; JX-074 at SF0368730; PX-373 at SF00381427).

Footnote 16:That Citi maintained consistent efforts in connection with the Equity Club following the April 2016 Letter is frankly unsurprising. Citi had every incentive under the Agreement to ensure the Equity Club's success in an effort to increase the fees to which it would be entitled (see Tr 238:21-239:1; Agreement § 3 [a]).

Footnote 17:Silverfern's reliance on Citi's apparent failure to maintain marketing records does not alter this conclusion (see SF br ¶ 44; SF reply at 12-13). It is true that, under Section 1(c)(v) of the Agreement, Citi represented that it would "maintain[] such marketing records for the placement of Class B Interests under this Agreement as required under [its] internal policies and procedures" (Agreement § 1 [c] [v]). But as Dan O'Donnell credibly testified during cross examination, Citi was able to comply with this provision by providing information to Silverfern regarding those investors who subscribed to Silverfern's investment opportunities (see Tr 187:3-15).

Footnote 18:Because Silverfern has failed to establish that Citi breached the Agreement, the court need not, and does not, address whether Silverfern established its entitlement to damages, including whether Silverfern's purported damages were "directly traceable" to Citi's purported breach (see P.W.B. Enters., Inc. v Moklam Enters., Inc., 243 AD2d 350, 351 [1st Dept 1997]).